UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KATHLEEN E. STEELE,

   Plaintiff,

 v.

COMMISSIONER OF SOCIAL
SECURITY,

   Defendant.

18-CV-1190
DECISION AND ORDER

---

On October 26, 2018, the plaintiff, Kathleen E. Steele, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that she was not disabled. Docket Item 1. On April 25, 2019, Steele moved for judgment on the pleadings, Docket Item 10, and on May 1, 2019, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 12.

For the reasons stated below, this Court grants in part and denies in part Steele's motion and denies the Commissioner's cross-motion.

## **BACKGROUND**

### I. PROCEDURAL HISTORY

On December 27, 2014, Steele applied for Disability Insurance Benefits. Docket Item 9 at 98. She claimed that she had been disabled since September 10, 2013, due to narcolepsy, focal slowing in the left temporal region of the brain, and emphysema. *Id.*

On April 3, 2015, Steele received notice that her application was denied because she was not disabled under the Act. *Id.* at 110. She requested a hearing before an administrative law judge ("ALJ"), *id.* at 115, which was held on March 27, 2017, *id.* at 44. The ALJ then issued a decision on September 13, 2017, confirming the finding that Steele was not disabled. *Id.* at 20-33. Steele appealed the ALJ's decision, but her appeal was denied, and the decision then became final. *Id.* at 5.

## II. RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Steele's appeal. Steele was evaluated by several different providers, but three—John J. Kalata, D.O.; Aaron Dewitt, D.O.; and Dilip S. Kar, M.D.—are of most significance to the claim of disability here.

### A. John J. Kalata, D.O.

In February 2015, Dr. Kalata, Steele's family physician, completed a medical source statement. Docket Item 9 at 364-69. He opined that Steele could lift up to twenty pounds occasionally, carry up to ten pounds occasionally, stand and walk for one-half hour each in an eight-hour workday, and sit for four hours in an eight-hour workday. *Id.* at 364, 368. He explained, however, that "all [of those] activities are limited and [Steele] can only do them inconsistently because of the tendency to fall asleep." *Id.* at 365.

Additionally, Dr. Kalata found that Steele could only occasionally balance, stoop, kneel, crouch, and crawl, and that she could never climb stairs, ramps, ladders, or scaffolds "due to narcolepsy." *Id.* at 367. He opined that Steele could occasionally tolerate humidity, wetness, respiratory irritants, and extreme temperatures but could

2

never tolerate unprotected heights and moving mechanical parts. *Id.* at 366. And he reported that although Steele could perform a variety of activities, including shopping and traveling without assistance, she could not use public transportation "due to narcolepsy." *Id.* at 369.

In March 2017, Dr. Kalata wrote a letter to Steele's attorney providing more detail about Steele's narcolepsy. *Id.* at 585. Dr. Kalata noted in the letter that he had been Steele's family physician from 2008 until 2016 when she relocated. *Id.* He stated that Steele had "suffered with severe narcolepsy since at least 2012, although she had complaints of profound fatigue as early as 2008." *Id.* She had tried numerous medications but "still was symptomatic despite meds at the time she left our practice." *Id.* Moreover, "[f]rom a functional standpoint, [Steele] went from being a functional member of the workforce to being unable to consistently sustain work." *Id.* "She needed to nap frequently and would fall asleep frequently during the day"—"persistent problems that occurred almost daily." *Id.* Dr. Kalata added that "[t]hese symptoms were confirmed on multiple discussions with [Steele's] boyfriend . . . who also was my patient." *Id.* Ultimately, Dr. Kalata concluded that although Steele "was motivated to get better, . . . she remained poorly functional and . . . unable to maintain employment." *Id.*

### B. Aaron Dewitt, D.O.

On March 23, 2015, Dr. Dewitt, an internist, examined Steele. Docket Item 9 at 396. He noted that Steele's "chief complaint" was that "she has [had] narcolepsy for the past four years." *Id.* "[S]he gets what she calls sleep attacks, where she will fall asleep and will be unaware that she has fallen asleep and is not trying to fall asleep." *Id.*

3

Steele cleaned, did laundry, and shopped "as needed" but "rarely" cooked. *Id.* at 397. She had tried various medications but still "ha[d] a hard time functioning because of her sleeping so much." *Id.* at 396.

Dr. Dewitt found that Steele was "dressed appropriately" and "maintain[ed] good eye contact." *Id.* at 399. She "show[ed] no evidence of impaired judgment" and "no evidence of significant memory impairment." *Id.* He diagnosed emphysema, narcolepsy, headaches, and left lateral epicondylitis. *Id.* He concluded that her emphysema limited her to only occasionally climbing, stooping, balancing, kneeling, crouching, crawling, and climbing stairs, ramps, ladders, and scaffolds. *Id.* at 410. Dr. Dewitt also opined that due to Steele's emphysema, she could only occasionally tolerate unprotected heights, humidity, wetness, and extreme cold, and that she could never tolerate dust, odors, fumes, pulmonary irritants, or extreme heat. *Id.* at 411. He did not, however, find any limitations on her ability to work due to her narcolepsy. *See id.* at 407-12.

### C. Dilip S. Kar, M.D.

Dr. Kar, a non-examining physician, reviewed Steele's medical records in April 2015. Docket Item 9 at 103-07. Based on that review of the records, Dr. Kar found Steele's "statements [to be] partially credible." *Id.* at 106.

Dr. Kar opined that Steele could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. *Id.* at 105. Additionally, Dr. Kar found that Steele could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl, but that she could never climb ladders, ropes, or scaffolds due to her narcolepsy.

4

*Id.* at 105-06. Dr. Kar also noted that Steele must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dust, gases, and poor ventilation, and must avoid all exposure to hazards and machinery. *Id.* at 106.

### III.  THE ALJ'S DECISION

In denying Steele's application, the ALJ analyzed Steele's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R. § 404.1520. At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from a severe impairment or combination of impairments. *Id.* § 404.1520(a)(4)(ii). If there is no severe impairment or combination of impairments, the claimant is not disabled. *Id.* If there is a severe impairment or combination of impairments, the ALJ proceeds to step three. *Id.* § 404.1520(a)(4).

At step three, the ALJ determines whether a severe impairment or combination of impairments meets or equals an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). If the claimant's severe impairment or combination of impairments meets or equals one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that no severe impairment or combination of impairments meets or equals any in the regulations, the ALJ proceeds to step four. *Id.* § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See id.* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e). The RFC is a holistic

5

assessment of the claimant—addressing both severe and non-severe medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See id.* § 404.1545.

After determining the claimant's RFC, the ALJ completes step four. *Id.* § 404.1520(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. *Id.* § 404.1520(f). But if the claimant cannot, the ALJ proceeds to step five. *Id.* §§ 404.1520(a)(4)(iv); 404.1520(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Here, at step one, the ALJ determined that Steele had not engaged in substantial gainful activity since September 10, 2013, the alleged onset date of her disability. Docket Item 9 at 22. At step two, the ALJ found that Steele had the following severe impairments: narcolepsy, emphysema, and headaches. *Id.*

At step three, the ALJ determined that Steele did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Docket Item 9 at 26. At step four, the ALJ determined that, based on the entire record, Steele had the RFC to "perform light work" with the following limitations:

6

> The claimant is able to sit for one hour at a time and for four hours total in an eight-hour workday. The claimant is able to stand for one hour at a time and for five hours total in an eight-hour workday. The claimant is able to walk for one hour at a time and for three hours in an eight-hour workday. Although the claimant is unable to climb ladders, ropes, and scaffolds, she is occasionally able to balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant is occasionally able to operate foot controls bilaterally, and she is frequently able to reach, handle, finger, feel, push, and pull with her bilateral upper extremities. The claimant must avoid work at unprotected heights or around dangerous machinery. The claimant must avoid concentrated exposure to extreme heat, extreme cold, dust, odors, fumes, and pulmonary irritants. In addition, the claimant is limited to simple, routine tasks and to simple work-related decisions, and she is able to tolerate minimal changes in work routines and processes.

*Id.* at 26.

Finally, based on that RFC and the testimony of a vocational expert ("VE"), the ALJ found that there are a significant number of jobs in the national economy—including a "[m]ail [c]lerk," a "[p]hotocopy [m]achine [o]perator," and a "[f]older"—that Steele can perform. *Id.* at 32.

## **STANDARD OF REVIEW**

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the

7

determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

### I. ALLEGATIONS

Steele argues that the ALJ's RFC determination failed to account for her narcolepsy. Docket Item 10-1 at 4. Specifically, she contends that the ALJ erred in giving reduced weight to the opinion of Dr. Kalata, her family physician. *Id.*

### II. ANALYSIS

When determining a plaintiff's RFC, an ALJ must evaluate every medical opinion received. 20 C.F.R. § 416.927(c). But an ALJ generally should give greater weight to the medical opinions of treating sources—physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists who have "ongoing treatment relationship[s]" with the claimant—because those medical professionals are most able to "provide a detailed, longitudinal picture of [the claimant's] medical impairments." *See* 20 C.F.R. § 404.1527(a)(2), (c)(2); *see also Genier v. Astrue*, 298 Fed. App'x 105, 108

(2d Cir. 2008) (summary order). In fact, a treating physician's opinion is entitled to controlling weight so long as it is "well-supported [sic] by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." § 404.1527(c)(2).

Before an ALJ may give less-than-controlling weight to a treating source's opinion, "the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and[ ] (4) whether the physician is a specialist." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (alteration omitted). These are the so-called "*Burgess* factors" from *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight" to a treating source opinion "is a procedural error." *Id.* at 96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

Here, the ALJ gave "reduced weight" to the opinion of Dr. Kalata, Docket Item 9 at 29-30, a family physician who had treated Steele over the course of eight years, *see id.* at 585. The ALJ explained that she discounted Dr. Kalata's opinion "because it [was] not supported by adequate explanation and because the check-box opinions [were] inconsistent with the longitudinal medical evidence in the record, including the well-supported opinions of Dr. Dewitt and Dr. Kar." *Id.* at 29. Although Dr. Kalata's 2017 letter provided more detail on Steele's narcolepsy, the ALJ "continue[d] to give reduced weight to Dr. Kalata's opinions because they [were] inconsistent with the balance of the evidence in the record, including the clinical findings and the reported activities of daily

9

living." *Id.* at 30. For example, the ALJ said, "treatment notes indicate[d] that [Steele] was active during the day despite her impairments and variable responses to medications." *Id.* Additionally, the ALJ noted, Steele "testified at the hearing that [Dr. Kalata] was not treating [her for] narcolepsy." *Id.*

In reaching that conclusion, the ALJ did not address "the frequency, length, nature, and extent of [Dr. Kalata's] treatment." *See Greek*, 802 F.3d at 375. In particular, the ALJ did not consider Dr. Kalata's eight-year treating relationship with Steele. Moreover, Dr. Kalata referred Steele to a neurology specialist, Jingzi Shang, M.D., to treat her narcolepsy; Dr. Kalata discussed Steele's narcolepsy symptoms in the course of treating her; and Dr. Shang sent Steele's neurology treatment records to Dr. Kalata. *See* Docket Item 9 at 433, 531, 540-65. The ALJ did not consider any of that but instead seemed to accept Steele's lay understanding that Dr. Kalata "was not treating [Steele's] narcolepsy." *Id.* at 30.

What is more, the ALJ failed to consider "the amount of medical evidence *supporting* [Dr. Kalata's] opinion." *See Greek*, 802 F.3d at 375 (emphasis added). For example, the ALJ quoted October 2015 neurology treatment notes stating that Steele was "reportedly doing better, she is able to sleep some days now . . . she has always been a busy person and doing a lot in the house during the day." Docket Item 9 at 28 (quoting *id.* at 560). But one of the sentences the ALJ omitted in that quote stated that Steele still "may fall asleep [at] any time of the day." *See id.* at 560. So the ALJ seems to have emphasized evidence contrary to Dr. Kalata's opinion at the expense of evidence supporting it.

Ignoring two of the *Burgess* factors—"the frequency, length, nature, and extent of treatment" and "the amount of medical evidence supporting the opinion," *see Greek*, 802 F.3d at 375—and then assigning less-than-controlling weight to Dr. Kalata's opinion was procedural error. *See Estrella*, 925 F.3d at 95. "Because the ALJ procedurally erred, the question becomes whether 'a searching review of the record assures [the Court] that the substance of the [treating-physician] rule was not traversed'—*i.e.*, whether the record otherwise provides 'good reasons' for assigning 'little weight'" to Dr. Kalata's opinion. *See id.* at 96 (alterations omitted) (quoting *Halloran*, 362 F.3d at 32); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining remand where "application of the correct legal principles to the record could lead [only to the same] conclusion"). This Court finds no such assurance here.

Dr. Kalata opined that "all [of Steele's] activities are limited and [she] can only do them inconsistently because of the tendency to fall asleep." *Id.* at 365. There is ample support in the record for that conclusion. *See, e.g.*, Docket Item 9 at 445 (September 2014 neurology treatment notes reporting that Steele "admits that she will then fall asleep again multiple times throughout the day if she sits down[,] . . . has fallen asleep while driving[,] . . . [and] cannot even make it 10-15 minutes without falling asleep"); *id.* at 454 (December 2014 neurology treatment notes stating that Steele "fall[s] asleep at any time and any place, while working and driving"); *id.* at 572 (April 2016 neurology treatment notes indicating that Steele has a "sleep attack . . . 3-4 times per week").

Moreover, although Dr. Dewitt and Dr. Kar found that Steele could work despite her narcolepsy, neither was a treating source. *Cf. Estrella*, 925 F.3d at 98 ("We have frequently 'cautioned that ALJs should not rely heavily on the findings of consultative

physicians after a single examination.'" (quoting *Selian*, 708 F.3d at 419)); *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987) ("A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis."). Indeed, Dr. Dewitt examined Steele only once, and Dr. Kar never saw her. Additionally, although both opinions purport to consider Steele's narcolepsy, neither explains how Steele would be able to work notwithstanding this condition. For example, Dr. Dewitt acknowledged Steele's statements that she could fall asleep without warning at any time but then found—without any explanation—that she could occasionally work at unprotected heights. Docket Item 9 at 411. Even worse, despite claiming to have considered Dr. Kalata's opinion, Dr. Kar stated that "there [were no] medical source opinions . . . about the individual's limitations or restrictions [that were] more restrictive than [Dr. Kar's] findings." *Id.* at 104, 107. And Dr. Kar discounted Steele's credibility despite never even meeting her. *See id.* at 106 (finding Steele to be "partially credible").

In light of the ALJ's failure to "explicitly consider" the *Burgess* factors before assigning reduced weight to the opinion of Steele's treating source, and because there are no apparent good reasons to support that assignment of weight, the ALJ violated the treating-physician rule. Moreover, this error may well have been harmful to Steele's disability determination. *See id.* at 87-88 (vocational expert testifying that an individual who was "off task at least 15 percent of the day" or who "required unscheduled breaks . . . of 15 minutes at least two times per day" would be unemployable). The matter therefore is remanded to the ALJ so that she can reconsider Steele's claim for disability

benefits consistent with the procedural mandates of the Act as interpreted by the Second Circuit.[1]

## **CONCLUSION**

For the reasons stated above, Steele's motion for judgment on the pleadings, Docket Item 10, is GRANTED in part and DENIED in part, and the Commissioner's cross-motion for judgment on the pleadings, Docket Item 12, is DENIED. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated: November 26, 2019
Buffalo, New York

*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

---

[1] Steele also argues that the ALJ erred in finding that her daytime somnolence and circadian rhythm sleep disorder were not severe impairments. Docket Item 10-1 at 4. Because the ALJ will revisit that issue on remand, there is no need for the Court to reach it here. *See Kuhaneck v. Comm'r of Soc. Sec.*, 357 F. Supp. 3d 241, 248 (W.D.N.Y. 2019).